**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES | : | No. 3:21 CR 194 (VAB) |
| | : | |
| v. | : | |
| | : | |
| DAVID KANIA | : | November 1, 2022 |

**DEFENDANT DAVID KANIA'S**
**MEMORANDUM IN AID OF SENTENCING**

The Defendant David Kania ("David" "Mr. Kania" or "Defendant"), in accordance with

Rule 32(o) of the Local Rules of Criminal Procedure, respectfully submits this memorandum in

aid of sentencing in connection with the above-captioned matter. Based on consideration of all

the factors set forth in 18 U.S.C. § 3553(a), including the United States Sentencing Guidelines

(the

"Guidelines"), the Defendant asks the Court to impose a sentence of probation, restitution, and

substantial community service.

**I.     The Sentencing Factors In 18 U.S.C. § 3553(a) Support A Sentence of Probation**

For the reasons set forth below, the circumstances specific to the Defendant, addressed in

a manner consistent with purposes of the federal sentencing scheme, justify a sentence of

probation.

**A.  The History and Characteristics of the Defendant and the Nature and**
**Circumstances of the Offense**

David Kania is a 62-year-old husband and father of two. Mr. Kania has no prior

experience with the criminal justice system – no arrests, no diversionary programs, no criminal

conduct whatsoever. David is a true first offender.

**Childhood**

David was born the middle son of Polish-American parents, Leo and Vivian Kania. David and his two brothers were raised in Middlefield, CT.  David grew up admiring his parents who demonstrated a strong work ethic and family-centric ideals. His Mother, a high school guidance counselor; his father a high school shop teacher. David recalls his father doing everything for his family, from refereeing his sons' soccer games and basketball games, to painting houses and selling encyclopedias, always keeping two or three jobs. He remembers his father giving at every opportunity, providing for his family, helping his community.

David's parents encouraged their children to value the importance of giving to others. David's father served in the Army in World War II, providing translation for Polish prisoners at the liberation of Auschwitz concentration camp. Both his parents were exemplar volunteers and active community members of Saint Mary's Church in Middletown. His mother was elected the first female President of Catholic Charities. David's mother showed him the importance of education not only through her work as a guidance counselor, but through her volunteer work overseeing the construction of the children's library at Russell Library in Middletown. Educational accomplishments were as important in the Kania household as altruism was. David's mother shared her love of education with her children, while David recalls his father proudly displaying his and his brothers' college bumper stickers on the back of his truck. His parents created a family environment that David held in high regard and hoped to emulate in adulthood.

**College and Employment**

After graduating Coginchaug High School, David attended Vanderbilt University. His Polish heritage was never lost on David, as he received his bachelor's degree in Russian and Political Science. Thereafter, in 1981, David was awarded a Fulbright Fellowship, a highly

competitive cultural exchange program under which exceptional students are given grants to study abroad.  David studied in Warsaw, Poland, living with a Polish family who was involved in the Solidarity Movement working for Polish freedom from the Soviet Union.  David was participating firsthand in the protests and demonstrations taking place on the streets of Warsaw at a time when martial law was declared.[1] As an American on Fulbright Fellowship he maintained direct connections with officials at the U.S. Embassy and used them to assist Polish-American families seeking to evacuate to the United States. He continued these efforts until he boarded the last plane leaving Poland allowed to land in the United States before sanctions on Poland took effect.

Upon returning to the United States, David enrolled in business school at New York University where he received his Master's in Business Administration, with a focus on International Business. Thereafter he worked for Citi Bank in New York. Feeling unfulfilled, David left Citi Bank and moved to San Francisco where he worked for Frito Lay. At the time David recalls that Frito Lay was opening a facility in Poland, and the CEO, knowing David spoke both Polish and Russian, sent him to Poland to assist in the opening of a new Frito Lay facility. After the successful opening, he worked with several other European companies setting up their base of operations in Poland and Ukraine, and spent time helping entrepreneurs set up their own businesses and coaching former Communist business owners how to enter the capital markets. Uniquely positioned in Poland as highly educated, trilingual, and with business management experience, David's career flourished, which allowed him to purchase a vacation house in Greece.

---

[1] https://www.reaganlibrary.gov/archives/speech/statement-lifting-economic-sanctions-against-poland

However, the thing he most desired was to have a family, which for a gay man in the 1990s did not come easily. David was in the process of adoption overseas with his then partner while living in Poland and Ukraine, when his brother told him about an ABC 20/20 segment on gay surrogacy.[2] Utilizing a surrogate mother, David's first son was born in 2001 and David returned to the United States to raise him.  However, David and his then partner separated. David thereafter had a second son by surrogacy, and after the birth of his second son, the family of three moved back to Poland in 2006.

As David's kids began participating in sports, he noticed that the children were drinking unhealthy sodas and sugary juices during their games.  In June of 2008, David sought guidance from a Professor in the United Kingdom to help him develop a nutritionally appropriate sports drink specific for children.  Counsel has reviewed extensive documentation and correspondence regarding the ensuing extensive development of a legitimate product and the attempts to bring it to market.  Around that same time, David and his kids were visiting his parents in Connecticut when he met his now husband. David moved his family back to Connecticut that same year. David's husband has acted as a parent of both children since.  From 2008 to 2012, David raised his children and worked in the home while continuing to develop the youth nutritional drink concept.

David connected with a nutrition specialist, and the owner of VitalNutrients, a supplement company in Middletown. He helped Kania network with several individuals in the nutrition industry including the owner of Venus Research & Development ("Venus R&D"), an organic food development firm in Santa Cruz, CA. Together, Kania and Venus R&D worked to establish the flavors, texture, sweetness types, and levels of sweetness all while prioritizing the

---

[2] A Day in the Life: Two Men Raising Triplets https://abcnews.go.com/2020/story?id=123947&page=1

nutritional value of the drink. After experimenting with different beverage flavors and ingredients, the first sports drink was fully developed and branded AKVOSport.

Since the start of the project, David was investing his own money into the business. By the middle of 2010, he had invested around $250,000 in personal funds, but was unable to secure additional private funding.  David brought on several employees and partners to work on marketing and product launch, to act as consultants on the project, to conduct business analyses and created a financial/investment plan, and to develop packaging and graphic design.  David continued to fund the project with his own money.

**ThinkitDrinkit and Noremac**

Hoping to expand his audience and attract investors, in the beginning of 2012 David changed the brand name from AKVOsport to ThinkitDrinkit, and expanded the concept of his business from youth sports drinks to an individualized dietary supplement. David connected with local officials to inquire about grant funding. He met with The Hartford Economic Development Corporation (HEDCO), and the Department of Economic Community Development (DECD).

In the summer of 2012, David met with DECD, but was informed that ThinkitDrinkit LLC did not meet the two-year requirement to receive assistance since it had only been formed a year earlier. David applied for the assistance under Noremac LLC, an existing business of David's that would satisfy the two-year requirement. Noremac LLC was approved to receive a $100,000 grant and a $125,000 loan. David used the funding to kick start production of ThinkitDrinkit.

David and his partners expanded ThinkitDrinkit establishing an office on Huyshoppe Avenue in Hartford, purchasing supplies and packaging materials, hiring staff for research and product development, IT, marketing, and FDA compliance. The product came to market as a

dietary supplement in powder format, and David applied for a trademarks of the ThinkitDrinkit brand, also known as TiDi.

**STEP UP**

During one of his discussions with the Small Business Express Program at DECD, David learned about the Step Up Program, Ready-to-Work and REACH Programs. These initiatives sought to provide incentives to companies hiring and training unemployed jobseekers, allowing individuals in need, including veterans, to re-enter the workforce.[3]  David expressed interest in the program, and began to discuss his options with a regional manager of the Step Up Program David applied for Step Up employees under the Noremac LLC, the company funding the ThinkitDrinkit brand. By March 2013, David began hiring staff through Step Up.  Under David's agreement with Step Up, the program would reimburse Noremac for the hours each employee worked, but with a maximum of $12,000 - $12,500 per employee over a maximum six month period. The Step Up employees were required to pass an interview and present valid identification with Connecticut Workforce Partners, and veterans were required to present their DD214 showing an honorable discharge from service. Candidates also needed to meet with a representative from CT Works who would validate their credentials and conduct a personal interview.  These employees were payed through a payroll company at this time.

Throughout 2013 and 2014, ThinkitDrinkit made significant production progress and received considerable recognition. Step Up and REACH employees were valuable in processing and packaging ThinkitDrinkit product.  The ThinkitDrinkit website launched to promote the brand and offer online sales.  ThinkitDrinkit developed a mentorship program with

---

[3] https://www.workplace.org/step-up/

Buckley High School in Hartford[4] and brought in students after school to work alongside staff. The company participated in a social entrepreneurship program called ReSet, and partnered with Urban4-H, a division of UConn, to provide nutritional education workshop.[5] David and ThinkitDrinkit were written about by the Hartford Business Journal[6], Hartford Courant[7] and the CTMirror.[8] David appeared on Better Yet Connecticut, and the company received recognition from government officials.[9]

       In 2014, however, the project went sideways.  David elected to spend capital to open an ill-fated brick-and-mortar store in the newly developing Storrs Center near UCONN. It was plagued by months of construction delay.  When it finally opened, the whole development was cut off by other ongoing construction which eliminated any real foot traffic and the store made little to no income.  The decision to use unemployed programmers to develop the web-based sales site was ill-advised as the site did not work well and online sales did not provide income. David invested capital in a grant writer who promised to deliver a grant from the US Department of Health & Human Services to be issued in 2016, that promised to support the project for years. It soon became clear that the grant writer had no ability to deliver the promised grant.  The only remaining income to the businesses was the Step Up money.

**The Offense**

       As noted, the Step Up program, required a business to use certain approved employees for a limited duration.  Beginning in 2014, after storefront and online sales faltered and the grant

---

[4] https://www.courant.com/community/hartford/hc-xpm-2013-10-26-hcrs-81368-hartford-20131024-story.html
[5] https://news.extension.uconn.edu/tag/thinkitdrinkit/
[6] https://www.hartfordbusiness.com/article/hfd-startups-personalized-beverages-cater-to-health-conscious-consumers
[7] https://www.courant.com/business/hc-xpm-2014-02-18-hc-thinkit-drinkit-20140218-story.html
[8] https://ctmirror.org/2013/12/16/malloy-mixes-politics-nutrition-jobs-visit/
[9] https://portal.ct.gov/DECD/Press-Room/Press-Releases/2013/2013-12-16-Gov-Malloy-Tours-Growing-Nutrigenomics-Startup-in-Hartford

did not materialize, through 2018, David submitted false documents to the wage subsidy programs for employees who were no longer working or never worked, and received money to pay said individuals but used the money for other purposes.  David utilized another business in the name of a straw owner in order to obtain additional funding in the same manner.  In total, $941,722.24 in the wage subsidy program money was not used for its designated purpose.

In 2016 and 2017, David also submitted false documents to the Manufacturing Innovation Fund ("MIF"), which reimbursed costs of training manufacturing employees.  In actuality, no training had been provided and the invoices were fake.  $115,000 was fraudulently obtained from the MIF program and used for other purposes.  Combined, the total loss amount to the Government is $1,056,723.24.

David, who never took a salary, paid personal expenses from the business accounts, which after 2014 were almost entirely funded by Government funds, but did not report these payments as income.  Accordingly, David filed false U.S. Individual Income Tax Returns from 2014 through 2018, by failing to include all the personal expenses David paid through his businesses. The total personal expenses paid through the business accounts, which David did not include as income on his personal tax returns over the five-year period, amounted to $299,201.50.

The discrepancy between the misappropriated government funding and the unreported income reflects that much of the funding, though misappropriated, was going back into the failing business to pay expenses, to pay unapproved employees, and to generally keep the business afloat.  Of the unreported income, most of it was spent on groceries, supplies, utilities, but there were some expenses that indicated privilege – tennis expenses for the children, private

school tuition for the children, and payments on a Lexus.  However, the majority of the unreported income was spent on the expenses of daily living.

Instead of owning his failure, and facing his husband and children with the truth, and letting the business fail, he intentionally misused Government funds over time.  There is no valid excuse.  It was self-interest over right.  David treated Government funding as if it were venture capital or his personal expense account.  One can only note that over the first 55 years of his life he did not offend, and he started here with the best of intentions with a real business with a real product, but faltered and then would not accept failure until 2018.

**Investigation**

By 2020 David had shuttered all the businesses (the storefront had closed in 2016) and resolved any outstanding debts with the State but the matter was referred to the Department of Labor ("DOL") and the Internal Revenue Service ("IRS").  Mr. Kania was initially interviewed by DOL and IRS agents in February 2020, and was not forthcoming but immediately engaged undersigned counsel who contacted the Government and expressed a willingness to plead guilty and accept responsibility without indictment.  After a COVID delay, Mr. Kania was again interviewed, October 20, 2020, with counsel, and admitted to the charged conduct.  The Government and Undersigned worked through some more of the evidence and there was a change in counsel for the Government when predecessor counsel left government service.  Mr. Kania met with agents and current counsel for the Government again on October 6, 2021.  On November 15, 2021, the Defendant entered a plea of guilty to each count of a two-count information, which charged him with Wire Fraud in violation of Title 18, U.S.C. § 1343, and Filing a False Tax Return, in violation of Title 26, U.S.C. § 7206(1) for the calendar year 2016.

**Restitution**

Restitution will be partially paid before sentencing. The defendant has nearly completed selling his only solely owned property, a home in Greece he purchased in 1995 when he was living in Europe.  All proceeds (less fees) will be utilized for restitution.

David's husband has bought out David's portion of their current residence in Florida and the equity has been set aside in our client's trust account for restitution. David does not have retirement or savings, and the only other objects of value he owns are ancient Chinese artifacts that he acquired throughout his life and David has offered those to pay restitution. David has engaged two European auction houses and the American auction house, to source buyers for the pieces, though no buyer has yet been identified.

**Post-Offense Employment and Community Service**

Following the failure of his business, David worked for the Census Bureau and was promoted to manager.  Once the Census was completed, David utilized unemployment until finding temporary work as a COVID contact tracer, which he undertook until contract tracing was terminated.  He has recently undertaken work at a call center.  David has worked is entire life.

David is actively volunteering for the Red Cross, most recently participating in Disaster Relief from Hurricane Ian, and for The Pride Center at Equality Park, which supports the LGBTQ+ community in South Florida.

**Medical Issues**

As set forth in the PSR at paragraphs 60 - 64, the Defendant has substantial medical issues that are chronic and which put him at great risk for deterioration and pain.

**Family**

David is ashamed and contrite and most concerned about the effect of his conduct on his children and husband and how they view him as a result of this. He is very proud of his kids, who are accomplished students and athletes. David is and has always been intensely involved in the lives of hid children at every step. He is a supportive, invested, loving and devoted father. Under his parenting they have succeeded in every measure, both exceling in college. However, he feels like his conduct here has undermined all of that goodness. He feels he has let them down and let his husband down by burdening them with the consequences of his offense and shaming them with his actions. He hopes to be able to make amends by paying restitution as quickly as possible.

### B.  Probation is an Available Sentence

The Sentencing Reform Act directed that: "The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . . ." 28 U.S.C. § 994(j).

A violation of 18 U.S.C. § 1343, Wire Fraud, is classified pursuant to 18 U.S.C. §3559(a)(4) as a Class C Felony and violation of 26 U.S.C. § 7206(1) for Filing a False Tax Return is classified pursuant to 18 U.S.C. §3559(a)(4) as a Class D Felony.

Accordingly, the classification of the sentences makes the Defendant explicitly eligible for a sentence of probation of not less than one year nor more than five years. 18 U.S.C. § 3561(a) (1) & (c)(1). This is a reflection that the legislature, for purposes of the Sentencing Reform Act, considers these offense to not be so serious as to preclude a sentence of probation,

and within the mandate to impose a sentence other than imprisonment in this case, where the Defendant is a 62 year old first offender.

**C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records who Have Been Found Guilty of Similar Conduct**

The Defendant's complete lack of any criminal record entitles him to be considered as a true first offender and an appropriate candidate for a sentence that does not require incarceration. The below-guidelines sentence requested herein, probation, is proportionally consistent with similar offenders. In 2019, 39.6% of all fraud offenders[10] received a downward variance below guideline sentence,[11] while 55% of all tax offenders received a below guidelines sentence that was based on a variance that was not government sponsored.[12] Further, a full 30% of all true first offenders (no prior arrests) are sentenced across the board for all offenses to probation-only sentences.[13]

Thus, a sentence of probation is consistent with sentences imposed on similar offenders and offenders with similar criminal histories. The offense conduct as articulated above, its general aberrance in an otherwise law abiding and productive life, sets him apart from others convicted of the same offenses.  The Defendant is of course a unique individual and his particular offense singular, so as set forth herein, any disparity present to defendants in other cases is otherwise warranted based on the history and characteristics of the defendant and the nature of the offense as set forth herein.

---

[10] Theft, Property Destruction, and Fraud offenses include cases in which the offender was sentenced under §2B1.1 (Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States).

[11] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick facts/Theft_Property_Destruction_Fraud_FY21.pdf

[12] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY16.pdf

[13] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

### D.   The Need to Provide Restitution

18 U.S.C. § 3553(a)(7) identifies "the need to provide restitution to any victims of the offense" as a key consideration at sentencing. Defendant has sold real property, and utilized family and his available resources to collect and pay down restitution before sentencing. Counsel will have delivered a check made out to the United States Treasury to the Case Agent before sentencing however there will likely be additional restitution to be paid. The fact of substantial restitution paid in advance of sentencing should be taken into account along with the the defendant's willingness to work to pay the remainder as quickly as possible while under supervision.

### E.   Consideration of the Sentencing Guidelines

The Defendant has no criminal history.  The parties in our Plea Agreement stipulated to a guidelines calculation that resulted in a recommended range of 21 to 27 months with the ability to argue for a non-guidelines sentence.

**Departure Considerations**

Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."  § 5H1.1. Age (Policy Statement).  This places a downward departure for age when the defendant is elderly and infirm in the "*encouraged*" category sanctioned by the Supreme Court in Koon v. United States, 518 U.S. 81 (1996). See also 5H1.4 (Policy Statement) (downward departure encouraged for infirm defendant).

## II.    A Below-Guidelines Sentence of Probation is Reasonable

### A. The Age And Physical Condition Of The Defendant Justify Sentence of Probation

The Defendant is 62 years old, while not technically elderly, he is certainly an older defendant.  The Defendant suffers from chronic medical issues including respiratory and spine issues.  The Defendant's age and physical condition make the prospect of a prison cell and the limitations therein unbearably painful and difficult, thus a sentence of incarceration for any term is much more significant than it would be for someone either younger or healthier. Additionally, as noted in the probation report, David has a history of many medical issues that would be compounded by COVID.  He would face increased exposure to COVID and other infectious diseases in the prison environment.

The International Red Cross Summary Report on Ageing and Imprisonment makes the following recommendations at sentencing:

> In sentencing, the judiciary should consider the appropriateness of imprisonment, in view of issues such as "remaining life upon release" and the "pain quotient", when contemplating a custodial sentence. They should systematically evaluate and consider effective alternatives to incarceration for older adults, especially for those with cognitive impairment or dementia. Qualified doctors should be involved, always in line with medical ethics, in certifying "fitness for incarceration.[14]

Jail should be avoided if possible for a 62 year old, non-violent, first offender, with compromised health, unless there is clear evidence that incarceration is required to protect the public or needed to punish the offender.

---

[14] https://www.icrc.org/en/publication/ageing-imprisonment-summary-report (page 36) (8/27/22).

**B.  The Defendant's Low Risk of Recidivism, Lack of Threat to Public Safety and the Aberrance of The Defendant's Conduct in an Otherwise Law Abiding, Productive Life, Merits a Sentence of Probation**

As noted, the Sentencing Reform Act directed that: "The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . . ." 28 U.S.C. § 994(j). The Commission also specifically noted in the introductory discussion of probation and split sentences: "The Commission, of course, has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures." U.S.S.G. Ch. 1, Pt. A, intro comment 4(d). In addition to the foundational concept of sentencing that a first offender is less culpable than a repeat offender, it is also true that a "true" first offender (no prior arrests) has the lowest recidivism (arrest, conviction, or revocation) rate at 6.8 % and a reconviction rate (conviction) at only 2.5 %.[15] The Defendant is thus at the lowest possible risk of recidivism and poses no threat the public safety.

The Court may also consider the aberrance of the defendant's conduct when crafting a reasonable sentence for the defendant. *See United States v. Germosen*, 473 F.Supp.2d 221 (D.Mass. 2007) (in a drug "mule" case, varying from a 37-46 month guidelines range to impose probation for two years, six months of which to be served in home detention, along with community service, on the basis of aberrant behavior).

In *Germosen*, the Court reflected that:

Germosen's case clearly reflects the kinds of congressional concerns animating 28 U.S.C. § 994(j), where the Commission was directed to consider probation for first offenders not

---

[15] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

> convicted of serious offenses. It reflects the Congressional concerns on which the "safety valve" is based, about the unfairness of applying a mandatory minimum sentence for non-violent, first offender drug defendants. It also reflects judges' concerns, based on the Guideline Manual's Introduction, for the real first offender, the person who literally has had no prior encounters with the criminal justice system. And it reflects the Commission staff's concerns about true first offenders, whose rate of recidivism is low.

*Id*. at 229-230.

While the defendant would not rightly qualify for a departure under §5K2.20 (aberrant behavior) because of the duration, planning and repetition of the relevant conduct in this case, the aberrance of this single course of criminal conduct represents a marked deviation by the defendant from an otherwise law-abiding life.

## III.   A Sentence of Probation As Requested Herein Is Sufficient But Not Greater Than Necessary To Comply With The Purposes Of Sentencing

The Court is directed by 18 U.S.C. § 3553(a), after consideration of circumstances particular to the individual before the Court, to "impose a sentence <u>sufficient, but not greater than necessary</u>" to comply with the purposes set forth therein.  (Emphasis added).  A sentence of probation is sufficient, and a sentence of incarceration is greater than necessary, to comply with these purposes.

### A.   The Principle of Incremental Punishment Warrants a Measured Increase from Defendant's Complete Lack of Prior Intervention to a Sentence of Probation

This so called "parsimony clause" incorporates the principle of incremental punishment which states that courts should generally impose incrementally increased punishment for repeated similar offenses to achieve specific deterrence.  A sentencing court may consider "the relationship between the punishment prescribed by [the guidelines] and the degree of punishment imposed for prior offenses" and that the "disparity in that relationship might indicate that the [guidelines] sentence provides a deterrent effect [] in excess of what is required in light of the prior sentences and especially the time served on those sentences . . . . "  <u>United States v.</u>

<u>Mishoe</u>, 241 F.3d 214, 220 (2d Cir. 2001) (analyzing career offender and departures pre-<u>Booker</u>).

David has had no prior sentence of imprisonment or any intervention at all and thus has had no opportunity to be deterred.  A sentence of probation would be incrementally greater and provide the necessary punitive and deterrent effect.

The risk of recidivism is particularly low. At age 62, being an employed, non-violent offender, with a college degree, in a marital relationship, David possesses many of the factors that indicate a low likelihood of offending again. U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (2004), exhibits 9, 10 and 11 thereto ("Commission Report").[16]

Notably, "[r]ecidivism rates decline consistently as age increases." Commission Report, at 12. The Commission Report shows that the recidivism rate for Defendants over age 40 who have no criminal history points is just 6.9 percent, which is drastically less than every other category. *Id*. at Exhibit 9. Even according to the National Institute of Justice, "A person's age is a powerful factor in deterring crime:"

> The data show a steep decline at about age 35. A more severe (i.e., lengthy) prison sentence for convicted individuals who are naturally aging out of crime does achieve the goal of punishment and incapacitation. But that incapacitation is a costly way to deter future crimes by aging individuals who already are less likely to commit those crimes by virtue of age.

National Institute of Justice, "Five Things About Deterrence." May 2016.[17]

The Defendant has already been specifically deterred and is not likely to offend again in the future. As this is Defendant's absolute first offense, there is no prior unsuccessful attempt at

---

[16] http://www.ussc.gov/pulicat/Recidivism_General.pdf.
[17] https://nij.gov/five-things/pages/deterrence.aspx

deterrence. Accordingly, any period of incarceration would be superfluous to the goals of deterrence.

**B.      Probation is a Sufficient Punishment to Promote Respect for the Law**

"§ 3553(a) does not command courts to send the strongest message possible; it commands them to impose a sentence that is "sufficient, but not greater than necessary." Id. at 860. United States v. Warner, 792 F.3d 847, 861 (7th Cir. 2015) (sentence of probation reasonable in tax loss case tax loss of $5.6 million where guideline range was 46-57 months). The Court can fashion a sentence that will reflect the seriousness of this offense, promote respect for the law and provide just punishment without placing David in confinement.

As the Supreme Court stated in Gall, "probation is not merely letting an offender off easily" but involves a "substantial restriction of freedom," "comprehensively regulate[s] significant facets of their day-to-day lives, subjects them to searches" and mandatory programming and "is not granted out of a spirit of leniency." Gall v. United States, 552 U.S. 38, 73 (2007) (citations omitted). Probation alone provides a sufficient measure of punishment.

**C.      A Sentence of Probation Reflects The Seriousness Of The Offense, Adequately Protects the Public and The Defendant has Demonstrated Respect For The Law**

In light of the mitigating factors set forth herein, the sentence requested proportionally reflects Defendant's conduct in this offense.  By his prompt decision to accept responsibility and plead guilty Defendant has demonstrated that he has respect for the law.  As demonstrated by his conduct for all of his life leading up to the criminal conduct as well as his compliant conduct since his arrest, and his age and low risk of recidivism (because of age and as a first offender) the public does not need to be protected from this Defendant.  Thus, we ask the court to view the Defendant's conduct in the context of an otherwise benevolent and purposeful 62 years, in

combination with his low risk of recidivism and lack of threat to the public, when fashioning a reasonable sentence.

> **D.     The Need For The Sentence Imposed To Provide The Defendant With Needed Educational Or Vocational Training, Medical Care, Or Other Correctional Treatment In The Most Effective Manner**

The Sentencing Reform Act of 1984 directs that:

> The Court, in determining <u>whether</u> to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added).  In the nearly three years since Agents appeared at his door, Defendant has not had any issues with supervision that are related to his offense.  Through the Defendant's substantially successful pre-trial release, we have proof that we have succeeded at finding the most effective way to provide "correctional treatment in the most effective manner" to the Defendant.  <u>See</u> <u>Pepper v. United States</u>, 562 U.S. 476, 491 (2011).  A period of supervision is the best means to support correction and rehabilitation to ensure the Defendant does not again offend.  Defendant's medical needs are best met by his existing doctors.  Rehabilitation and correction would not be advanced by incarceration, and are thus adequately addressed by a sentence of Probation.

**Conclusion**

For all the foregoing reasons, the Defendant respectfully requests that the Court, after consideration of all the factors in 18 U.S.C. § 3553(a), sentence the defendant to probation.

DEFENDANT,
DAVID KANIA

/s/ Morgan P. Rueckert
Morgan P. Rueckert (ct 19838)
Elizabeth H. Buchanan (ct 31230)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT  06103
Tel:   (860) 251-5000
Fax:  (860) 251-5219
MRueckert@goodwin.com
Ebuchanan@goodwin.com

**Certificate of Service**

I hereby certify that on November 1, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. A copy will be emailed to:

Marina Davila
United States Probation Officer
United States Probation Office
450 Main Street
Hartford, CT 06103

/s/ Morgan P. Rueckert
Morgan P. Rueckert (ct 19838)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT  06103
Tel:  (860) 251-5000
Fax:  (860) 251-5219
MRueckert@goodwin.com