UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                 CRIM NO. 3:21CR194 (VAB)

     v.

DAVID KANIA                        November 7, 2022

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Between roughly 2013 and 2018, David Kania defrauded the State of Connecticut out of more than $1 million.  Kania's theft was not borne of one isolated bad decision in an otherwise law-abiding life, but constituted a yearslong pattern of repeated fraud and deceit against a government that was looking to employ taxpayer money to help train and bring the long-term unemployed back into the workforce.  Instead, Kania used the money to benefit himself, through financing his everyday life, paying for luxuries such as a Lexus and private school tuition for his children, and trying to keep afloat his otherwise failing businesses.  He perpetuated the fraud through a series of false governmental filings, misrepresenting his use of these scarce public funds. While the Court should rightly consider the defendant's health concerns and his lack of criminal history in determining a sentence, those factors should not shield him from accountability for his five-year-long fraud.  The Court should, therefore, sentence the defendant to a meaningful term of imprisonment at the low end of the Guidelines range.

I.     Introduction and Background

    A.  Procedural History

On November 15, 2021, the defendant appeared before the Court and pleaded guilty to each count of a two-count information charging him with Wire Fraud, in violation of Title 18, United States Code, Section 1343 and Filing a False Tax Return, in violation of Title 26, United

States Code, Section 7206(1) for the calendar year 2016. The defendant's plea was pursuant to a plea agreement that, among other things, included a Sentencing Guidelines stipulation in which the parties agreed that the guidelines recommended a range of 27 to 33 months' imprisonment and a fine of $10,000 to $100,000. Although there is no explicit agreement on restitution, the parties agreed that the total loss caused by the defendant to the victim government programs was $1,056,723.24, including $941,723.24 in loss to the wage subsidy programs and $115,000 in loss to the Manufacturing Innovation Fund ("MIF") Program.

The defendant waived appeal so long as his sentence does not exceed 33 months of imprisonment, a three-year term of supervised release, a $100,000 fine, restitution of $1,056,723.24, and a $200 special assessment.[1]

B. Summary of the Facts

A fulsome summary of the offense conduct is set out in the PSR at ¶¶ 7-18, which the Government incorporates by reference and substantially restates or summarizes here.

Kania was the owner and operator of Noremac, LLC; Think It Drink It, LLC; and Akvisto, LLC. Think It Drink It, LLC was a dietary supplement company headquartered in Hartford, Connecticut. Noremac, LLC was initially formed by Kania as a real estate holding company for property he owned in Middletown, Connecticut and eventually began the production side of the business for Think It Drink It, LLC. Akvisto, LLC was formed by Kania to create children's beverages.

Through these three companies, during approximately 2013 through 2018, Kania applied for and received approximately $1,465,775.60 in funds from various programs through the State

---

[1] As discussed below, the restitution amount should be $1 lower than reflected in the plea agreement, due to a transcription error.

of Connecticut Department of Labor (CTDOL) that provided wage and training subsidies to employers that hire unemployed jobseekers, including veterans. These programs included the Subsidized Training and Employment Program ("Step Up Program"), the Re-Employment Alliance for Careers in Health ("REACH") program[2], and the Ready-to-Work program (collectively, "wage subsidy programs").

The Step Up program allowed manufacturing companies and certain small businesses that have fewer than 100 employees to hire individuals and have part of their salaries reimbursed by CTDOL for six months. The Ready-to-Work and REACH programs reimbursed a portion of employees' wages to an employer who provided on-the-job training to previously unemployed individuals (85% of the funds were dedicated to the long term unemployed). The Ready-To-Work program, which in turn funded REACH, was backed in part by grants from the United States Department of Labor. These wage subsidy programs were administered through regional "Workforce Investment Boards," also known as "Workforce Development Boards," which were established by Connecticut law. Those included Capital Workforce Partners and Workforce Alliance CT.

Kania's companies also received $115,000 through the Manufacturing Innovation Fund ("MIF") Program through the State of Connecticut that was intended to reimburse them for worker training.

But Kania's participation in these programs was based on lies and deceit.

First, in order to obtain subsidy funds under the various Connecticut wage subsidy programs, Mr. Kania at times submitted false documents to the CTDOL and the Workforce

---

[2] As relevant here, REACH subsidized hiring and training of Information Technology professionals as well as those in health-related fields.

Investment Boards that administered the wage subsidy programs showing that he had hired certain workers and they worked for his businesses for a certain period of time, when he knew that to be false.  A review of those records shows over 100 false documents submitted to wage subsidy programs.

For example, on December 1, 2017, as charged in Count One of the Information, Kania sent an email from his thinkitdrinkit.com account to an email account for an employee of Capital Workforce in Connecticut, a Workforce Investment Board administering the Step Up Program, attaching timesheets to support false and fraudulent claims for reimbursement for wages paid to Step Up Program participants, upon which the Step Up Program paid $10,368 to Noremac, LLC. This is one of many examples of submissions of false documents as part of the scheme.

While much of the grant money was applied for by Kania in his own name on behalf of his companies, Kania asked a friend to act as the operator of Akvisto for the purpose of applying for additional money through the wage subsidy programs.  Mr. Kania arranged for his friend to open a bank account for Akvisto on which the friend was the sole signatory and created an email address for the friend.  Kania used that email address to apply for additional subsidy funds for Akvisto, and used the bank account to receive the subsidy funds.  Mr. Kania signed the friend's name on Akvisto checks in order to access the funds.  Kania permitted the friend to retain a small amount of the Akvisto bank account funds as compensation.

Second, also as part of the scheme, Kania submitted false invoices to the MIF Program to be reimbursed for training that was never done.  The entirety of the $115,000 provided to Mr. Kania's companies under the MIF program was based on false representations that training was conducted as required.

4

The total loss caused by the defendant to the above-referenced government programs was $1,056,722.24, including $941,722.24[3] in loss to the wage subsidy programs—the vast majority of which was from the Step Up program—and $115,000 in loss to the MIF Program.

In addition to the above scheme, Mr. Kania also subscribed and filed false U.S. Individual Income Tax Returns, Forms 1040, for each of the years 2014, 2015, 2016, 2017, and 2018 with the Internal Revenue Service. Each return contained Mr. Kania's declaration that it was made under penalty of perjury. Mr. Kania did not believe the tax returns to be true and correct as to every material matter, specifically Line 22 (or, for 2018, Line 6), Total Income. In particular, Kania failed to include all of the personal expenses he paid through his businesses, Noremac, Think It Drink It, and Akvisto. In so doing, Kania acted willfully.

The following table shows the personal expense amounts paid through each of Kania's business bank accounts, which he did not include as income on his personal tax returns:

| Tax Year | Noremac #1105 | Noremac #8218 | Noremac #1086 | TIDI | Akvisto | Credits | Total |
|---|---|---|---|---|---|---|---|
| 2014 | $22,486.71 | $17,111.20 | $0.00 | $0.00 | $0.00 | ($11,512.00) | $28,085.91 |
| 2015 | $6,602.40 | $68,549.63 | $0.00 | $406.41 | $4,982.82 | ($11,512.00) | $69,029.26 |
| 2016 | $0.00 | $65,800.12 | $0.00 | $124.42 | 14,960.86 | ($11,512.01) | $69,103.39 |
| 2017 | $0.00 | $4,900.09 | $0.00 | $774.36 | $81,101.87 | ($11,512.01) | $75,264.31 |
| 2018 | $0.00 | $0.00 | $11,687.81 | $15,208.38 | $49,154.45 | ($18,512.01) | $57,718.63 |
| Total | | | | | | | $299,201.50 |

---

[3] These figures, related to the overall loss and loss to the subsidy programs, are $1 lower than in the plea agreement, due to an inadvertent transcription error.

Each column represents a different business bank account, distinguished in some cases by the last four digits of the account number.  The "credits" column represents the parties' effort to credit Mr. Kania for expenses or portions of expenses that reasonably could be considered business related.

Kania was initially interviewed, without counsel, in February 2020.[4]  In that interview, Mr. Kania contended that he had turned Akvisto over to his friend sometime in the prior 6-8 years. Kania acknowledged having applied for and received funds from the wage subsidy programs, but initially claimed that all of the timesheets he submitted for reimbursement were legitimate.  Kania did admit, however, that he used MIF grant money for non-training purposes (specifically, he said he bought packaging and mixers).  On October 20, 2020, Kania was again interviewed, this time under proffer protection and with counsel, and fully admitted to the charged conduct.[5]

II.    Sentencing Guidelines

The Government stands by the Guidelines calculation in the plea agreement, as follows: As the plea agreement sets out, the counts are grouped together under Section 3D1.2(d) into a single group because the offense levels are determined largely on the basis of the total amount of harm or loss. *See United States v. Gordon*, 291 F.3d 181, 189 (2d Cir. 2002); U.S.S.G. § 3D1.3. The figure used to compute the adjusted offense levels under the applicable sections of the Guidelines is obtained by combining the losses due to the wire fraud offense as well as the tax fraud loss. The parties further agree that the Guideline calculation under U.S.S.G. § 2B1.1 for the

---

[4] To the extent that any statements made in the first (uncounseled) interview were untruthful or incomplete, they did not "significantly obstruct[] or impede[] the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1 cmt. n. 4(G).  At that stage of the investigation, the agents were well aware that the defendant had provided false documents regarding participants in the wage subsidy programs, and that Kania was the true owner and operator of Akvisto.

[5] Under U.S.S.G. § 1B1.8 and the proffer agreement, the Government is obliged to make the Court aware of Kania's proffered statement, but the Court should not use this proffered statement in assessing the Guidelines range.

offense of wire fraud, as charged in Count One of the Information, produces a higher offense level than the Guideline calculation under U.S.S.G. § 2T1.1 for the offense of false tax return, as charged in Count Two of the Information. As a result, U.S.S.G. § 2B1.1 is used to determine the applicable Guidelines range. U.S.S.G. § 3D1.3(b).

The defendant's base offense level under U.S.S.G. § 2B1.1 is seven. That level is increased by 14 because the loss exceeded $550,000 but was less than $1,500,000. U.S.S.G. § 2B1.1(b)(1)(H). Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 18.

The defendant falls within Criminal History Category I. A total offense level of 18, assuming a Criminal History Category I, results in a range of 27 to 33 months of imprisonment (sentencing table) and a fine range of $10,000 to $100,000 (U.S.S.G. § 5E1.2(c)(3)). The defendant also is subject to a supervised release term of one to three years. U.S.S.G. § 5D1.2.

III.   Sentencing Factors

Consideration of the Guidelines and the statutory factors in 18 U.S.C. § 3553(a)(2) demonstrate that this is a serious crime warranting a term of imprisonment at the low end of the Guidelines range, even in light of the history and characteristics of this defendant, *see* 18 U.S.C. § 3553(a)(1).

A.   Seriousness of the Offense, Respect for the Law, and Just Punishment

By far the most significant consideration that calls for a substantial punishment in this case is the seriousness of the offense.  This case was not a momentary lapse in judgement, but a sustained, years-long scheme to steal more than a million dollars in public funds earmarked to provide assistance to the long-term unemployed.  There were over 100 false submissions to the

7

Connecticut DOL over the course of the fraud scheme.  Several factors in particular augur for a Guidelines sentence.

*First*, as Kania well knew, he stole funds that were supposed to help address long-term unemployment by bringing people in need into the workforce and training them so they can stay there.  *See* "NEARLY $170M IN READY TO WORK PARTNERSHIP GRANTS AWARDED TO HELP LONG-TERM UNEMPLOYED AMERICANS FIND WORK," News Release, United States Department of Labor, October 15, 2013, available at https://www.dol.gov/newsroom/releases/eta/eta20131015-0 (last visited November 6, 2022).  In other words, the money he stole came not just out of the pockets of eligible jobseekers, but it prevented them from acquiring the experience and job skills that could have been parlayed into long-term full-time employment.  Instead, the money found its way into Kania's pocket—some to prop up his failing businesses, some to pay his living expenses, and some to pay for luxuries like private school and a fancy car.

*Second*, Kania turned to fraud out of greed and ego, not true necessity, and despite every advantage in life.  He was—by his own account, *see* Def. Sen. Mem. at 3-4—highly educated, sophisticated, multilingual, and very experienced in the business world.  His "flourish[ing]" career even allowed him to buy a vacation home in Greece.  He grew up in a loving home with parents who were positive role models.  He has an undergraduate degree from Vanderbilt and an MBA from NYU, followed by a Fulbright Fellowship.  He has years of high-powered business experience for established companies and as an entrepreneur.  At the time of his fraud, he had children and a husband.

In short, Kania did not act out of real financial need, as many who come before the Court may legitimately claim.  He had choices—he was highly employable, he had a support network,

and he certainly knew right from wrong.  His would not have been the first business to fail, even among successful businessmen, and especially during an economic downturn.  Instead, he chose to place his own interests above those of society.  Kania claims that he should receive some allowance because "much of the funding" he stole "was going back into the failing business." Def. Sen. Mem. at 8.  But this is hardly a meaningful distinction—this was not a charity.  It was *his* business, whose profits would ultimately have benefitted him should the company have been successful.  And, of course, a substantial amount of money did go to pay Kania's own personal expenses.  In that way, Kania's crime falls squarely in the heartland of those crimes contemplated by the fraud Guidelines—he lied to enrich himself at the public's expense, and he was the person who stood to benefit from his greed and arrogance.

### B.  Adequate Deterrence and Protection of the Public

It seems unlikely that Kania is a significant risk to reoffend. At a minimum, Kania's conviction here will make it less likely (though, based on experience, not impossible) that he would be able to participate in another government program like the ones he deceived in this case.  That said, the extent and duration of Kania's crime points to a serious flaw in his moral and ethical calculus that will not heal quickly, nor without significant sanction from the Court.  This was not, as the defendant appears to argue an example pf "aberrant behavior" warranting probation.  Def. Sen. Mem. at 15.   Rather, it was a series of bad choices over five years in full view of the consequences of his actions.  That Kania knew that his conduct was wrongful makes it all the more alarming that he engaged in it anyway.

Moreover, even if specific deterrence is not a significant consideration, the Court should strongly consider general deterrence.  Fraud on government programs is particularly insidious, as it diverts scarce resources from critical social needs—few more important than promoting long-

term employment.  A Guidelines sentence here sends an important message that theft from such government programs will not be tolerated.

C.   History and Characteristics of the Defendant

In his sentencing memorandum, Kania suggests that he should be spared a prison sentence because of his age and certain heath issues, and because he is a first-time offender.  Def. Mem. at 14.

*First*, there is nothing in the defendant's health history that suggests he cannot tolerate a period of incarceration.  At 62, he is barely "old," let alone "elderly." While Kania suffers from various chronic conditions, PSR ¶ 64, some of which have existed for many years, none appear to be so unique that they cannot be sufficiently managed by the Bureau of Prisons.  Indeed, Kania appears to have lived, despite these conditions, a full and active life.

*Second*, the defendant's status as a first-time offender is adequately taken into account by the Guidelines.  If anything, a "Category I" designation is misleading here, as the defendant's conduct went on for several years and constituted numerous examples of fraud and theft—including over 100 submissions of false documents to the government.

*Third*, the defendant's claim that he should be spared prison because he has a college degree, is a non-violent offender, and is in a marital relationship, Def. Sen. Mem. at 17, is misplaced.  While these factors may indicate a statistical tendency against recidivism, they are also proxies for privilege.  That Kania perpetrated his offense despite these many advantages elevates the seriousness of his offense and the need for just punishment, regardless of the likelihood of re-offense.  *See* 18 U.S.C. § 3553(a)(2)(A).

*Fourth*, probation is not a sufficient sentence here.  While it is true that probation can "substantially restrict" a person's liberty, *Gall v. United States*, 552 U.S. 38, 48 (2007), it is

qualitatively less severe than a term of incarceration.  Moreover, for a non-violent offender such as Kania, there are unlikely to be meaningful probationary restrictions on his freedom that will adequately reflect the scale of his offense, even with some period of home confinement.

IV.    Conclusion

For the reasons stated above, the Government urges the Court to sentence the defendant to a term of imprisonment at the low end of the 27 to 33-month Guidelines range.

Respectfully Submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

/s/

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
157 Church St., 25th Floor
New Haven, Connecticut 06510
Tel. (203) 821-3700
Federal Bar No. phv02874

<u>CERTIFICATE OF SERVICE</u>

      This is to certify that on November 7, 2022, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/
_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY